UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALEXANDER S. GRAHAM,

        Plaintiff,

v.                                                  CASE NO.: 8:08-CV-1470-T-MAP

MICHAEL J. ASTRUE
Commissioner of Social Security

        Defendant.
_____/

## **ORDER**

Plaintiff seeks judicial review of the Commissioner's decision denying his claims for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] He argues that the Administrative Law Judge ("ALJ") erred by (1) failing to find Plaintiff disabled for the period from February 1, 1999 through November 30, 2001, (2) failing to properly evaluate Plaintiff's subjective complaints regarding his headaches, (3) failing to accept the opinion of the medical advisor, Dr. Linder, that Plaintiff could not do sedentary work after October 28, 2001, and (4) relying on an incomplete hypothetical question to the vocational expert ("VE"), in that he did not include any limitations in the hypothetical regarding Plaintiff's headaches nor mental limitations as a result of Plaintiff's depression and learning disability. After reviewing the record and the parties' memoranda, I find that the ALJ erred by arbitrarily selecting the date on which he found Plaintiff disabled and by failing to pose a hypothetical question including the limitations, if any, Plaintiff had as a result of his moderate impairment in social and occupational functioning or explaining his

---

[1] The parties have consented to proceed before me pursuant to 28 U.S.C. § 636(c) (doc. 14).

reasons for finding those impairments not credible. Accordingly, the Commissioner's decision is reversed and the matter is remanded for further administrative proceedings consistent with this Order.

*A. Background*

Plaintiff filed for a period of disability and DIB on October 13, 1999, and SSI on September 30, 1999, alleging a disability onset date of February 1, 1999. Plaintiff was thirty-two years old on the alleged disability onset date. He alleged disability due to lower hip and neck pain, migraines, depression, diabetes, a learning disability, and legal blindness. (R. 126). He has a high school education, attended some college and received specialized training in welding and eventually passed the first level of welding. (R. 468, 503, 505). During the course of his academic career from kindergarten through college, Plaintiff attended special classes and took medication for attention deficit disorder. (R. 500, 504). His past relevant work experience includes work as a salesman, construction laborer, welder, restaurant/bar worker, photographer, car wash attendant and credit card representative salesperson. (R. 506-12).

The Commissioner denied Plaintiff's claims both initially and on reconsideration. Plaintiff then requested an administrative hearing. Per his request, the ALJ held a hearing on January 9, 2002. (R. 494-546). After the hearing, the ALJ issued a partially favorable decision finding Plaintiff disabled as of December 1, 2001. (R. 29-37). Plaintiff timely appealed that decision to the Appeals Council, which vacated the decision and remanded the claims to the ALJ for further consideration. (R. 65-73). After conducting a supplemental hearing, the ALJ rendered another partially favorable decision finding Plaintiff disabled as of December 1, 2001. (R. 14-24). The ALJ found Plaintiff had the severe impairments of cervical and lumbar disc disease, diabetes, asthma, hypertension,

headaches, depression, and learning disability but that none of the impairments or a combination of the impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17). For the period from February 1, 1999 to November 30, 2001, the ALJ found Plaintiff had the RFC to perform a restricted range of sedentary to light work, restricted by the need for the opportunity to alternate between sitting and standing at will and the need to avoid climbing, balancing, and exposure to unprotected heights and dangerous moving machinery. (*Id.*). For that period, the ALJ determined Plaintiff could not perform his prior relevant work but that a significant number of jobs existed in the national economy that Plaintiff could have performed. (R. 22). In contrast, the ALJ found Plaintiff had the RFC to perform significantly less than a full range of sedentary work beginning December 1, 2001. (R. 21). The ALJ found that a significant number of jobs did not exist in the national economy which Plaintiff could perform beginning December 1, 2001. (R. 23). Accordingly, as with the initial decision, the ALJ concluded Plaintiff was not disabled for the period from February 1, 1999 to November 30, 2001, but Plaintiff became disabled on December 1, 2001, and continued to be disabled through the date of his decision. (R. 24).

After the ALJ rendered the second partially favorable decision, Plaintiff again requested review from the Appeals Council. Subsequently, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final decision of the Commissioner. Plaintiff has exhausted his administrative remedies and filed suit in federal district court. This case is now ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

*B. Standard of Review*

To be entitled to benefits, a claimant must be disabled, meaning he must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental

3

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, in order to regularize the adjudicative process, promulgated the detailed regulations that are currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a). Under this process, the ALJ must determine, in sequence, the following: whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, i.e., one that significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Subpart P; and whether the claimant can perform his or her past relevant work. If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of his or her age, education, and work experience. *Id.* A claimant is entitled to benefits only if unable to perform other work. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. §§ 404.1520(g), 416.920(g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The ALJ's "factual findings are conclusive if 'substantial evidence' consisting of relevant evidence as a reasonable person would accept as

4

adequate to support a conclusion exists." 42 U.S.C. § 405(g); *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation omitted). The Court may not re-weigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). However, the Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that she has conducted the proper legal analysis, mandates reversal. *Keeton*, 21 F.3d at 1066; *Jamison v. Bowen*, 814 F.2d 585, 589-590 (11th Cir. 1987).

    *C. Discussion*

        *1. Opinion of medical expert, Dr. Linder*

At the supplemental hearing, the ALJ employed the assistance of a medical expert, Dr. Linder. (R. 478-87).[2] The ALJ questioned Dr. Linder regarding Plaintiff's impairments during the period from February 1999 through November 2001. (*Id.*). During the course of questioning, the ALJ asked Dr. Linder his opinion regarding the level of Plaintiff's impairments prior to November 2001. (R. 481). Dr. Linder opined that Plaintiff could not do a full range of light or sedentary work as of February 1999 but the objective evidence did not support a complete inability to work according to the listing levels in 1999. (R. 482). Subsequently, the ALJ described sedentary work activity and asked Dr. Linder if the objective medical evidence supported a finding that claimant could not perform that level of work during the period in issue. (*Id.*). Dr. Linder responded that Plaintiff could perform work at the sedentary level in 1999. (R. 482-83). When asked at what point

---

[2] *See* SSR 83-20 ("How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.").

5

the objective evidence would support a finding that Plaintiff could no longer perform work at even the sedentary level, Dr. Linder opined that Plaintiff could not perform that level of work as of the date he fell down the stairs.[3] (R. 483). The record reflects that Plaintiff asserted he fell down the stairs in his apartment on October 28, 2001. (R. 352, 355, 358). Within days of the alleged fall, Plaintiff reported to the Northside Hospital and Heart Institute complaining of neck pain, back pain and headaches related to the fall. (R. 352-73). Indeed, all of the medical records for the time period from October 28, 2001 through December 1, 2001 relate to the October 28, 2001 incident and the corresponding complaints or injuries resulting from that incident. Despite Dr. Linder's testimony and the evidence of record, the ALJ found Plaintiff disabled as of December 1, 2001. Plaintiff contends, at the very least, the ALJ should have found Plaintiff disabled as of October 28, 2001.

When determining the disability onset date, the ALJ should set the onset date "on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death." SSR 83-20. The ALJ must provide a "convincing rationale" for the date selected. *Id.* In his decision, the ALJ failed to articulate the basis for finding Plaintiff disabled as of December 1, 2001, and appears to have arbitrarily selected that date as the onset date of Plaintiff's disability. Indeed, the evidence of record and the testimony of Dr. Linder support a finding that Plaintiff may have been disabled as early as October 28, 2001. Without providing an explanation, the ALJ essentially rejected this date and found Plaintiff disabled as of December 1, 2001.

---

[3] Dr. Linder mentioned that there could have been an intermediate date between 1999 and the date of Plaintiff's fall in October 2001 but the record did not contain much in the way of evidence to support that finding. (R. 483).

In finding the Plaintiff's allegations regarding his symptoms and limitations generally credible as of December 1, 2001, the ALJ cites to the opinions of Dr. Amatya and Dr. Wassel. Plaintiff sought treatment from Dr. Amatya from February through April 2002. None of the records from Dr. Amatya references any incident, diagnosis, or assessment related to or occurring on December 1, 2001. (R. 400-12). Similarly, Plaintiff sought treatment from Dr. Wassel in August 2002 and nothing in those records attributes any significance to the December 1, 2001 date. (R. 417-29). As a result, I find the ALJ erred by finding Plaintiff disabled as of December 1, 2001. Accordingly, the decision is reversed and remanded with instructions to the ALJ to consider the evidence for the time period from October 28, 2001 through December 1, 2001 as well as Dr. Linder's opinion in determining Plaintiff's disability onset date and to explain the basis for his decision.

### 2. *Subjective complaints regarding headaches*

Plaintiff contends the ALJ erred by failing to properly evaluate his subjective complaints regarding his headaches. When evaluating the intensity and persistence of a claimant's symptoms, including pain, the ALJ considers all of the available evidence, including the claimant's medical history, medical signs and laboratory findings and statements about how the claimant's symptoms affect him or her. 20 C.F.R. §§ 404.1529(a), 416.929(a). In making a determination, the Commissioner must consider all the claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective evidence and other evidence. *See id.* "Objective evidence" means medical signs shown by medically acceptable clinical diagnostic techniques or laboratory findings. *See* 20 C.F.R. §§ 404.1528, 416.928. "Other evidence," as that term is used here, includes evidence from medical sources, medical history, and

7

statements about treatment the claimant has received. *See* 20 C.F.R. §§ 404.1512(b)(2), 416.912(b). The Eleventh Circuit pain standard incorporates this scheme by requiring evidence of an underlying medical condition and either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (*per curiam*); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). In certain instances, pain alone can be disabling even if unsupported by objective evidence. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (*per curiam*).

As the record indicates, Plaintiff has a documented history of complaints regarding headaches. He sought medical attention for his headaches and associated pain from multiple treating and consultative physicians. From April to June 1999, Plaintiff sought medical attention from Dr. Rosario and reported a history of migraine headaches. (R. 219-27). Dr. Rosario noted he would not prescribe Plaintiff narcotics, noted Plaintiff was non-compliant and eventually sent Plaintiff a letter in June 1999 terminating Plaintiff's treatment with him after Plaintiff failed to show up for an appointment. (*Id.*). Plaintiff reported to Dr. Libreros-Cupido, a neurologist, in June and July 1999 with complaints of frequent and severe headaches that did not subside. (R. 331-33). Plaintiff informed Dr. Libreros-Cupido that Imitrex injections had provided him significant relief in the past. (*Id.*). Dr. Libreros-Cupido assessed Plaintiff as having a migraine headache in June (prescribing Imitrex, Elavil, and Naproxen) and "tensional" headaches in July (prescribing Vicodin and an increased dose of Elavil). (*Id.*). In February 2000, Dr. Echeandia examined Plaintiff as part of a disability physical examination. (R. 240-43). Dr. Echeandia noted that Plaintiff reported he had developed constant neck pain since a 1996 bike accident which flares up every two to three days and

causes him to have severe and sharp headaches lasting three days and occurring every two weeks. (R. 240). Plaintiff claimed to have previously taken pain killers and muscle relaxants but had run out of the medication. (*Id.*). During the course of the examination, Dr. Echeandia noted Plaintiff was in no acute distress although he constantly complained of discomfort and was not currently taking any pain medication. (R. 241-42). Dr. Echeandia did not identify any clinical impression regarding Plaintiff's headaches or associated pain. During the period from November 1999 through July 2000, Plaintiff sought treatment from Dr. Spallino. (R. 270-90). During a November 1999 examination, Dr. Spallino noted Plaintiff would grimace and groan when the doctor watched him but would not when the doctor closed the door. (R. 278). When Dr. Spallino would quickly walk back into the room, he observed Plaintiff walking around the room with no difficulty. (*Id.*). Dr. Spallino also noted that Plaintiff would scream out loud before Dr. Spallino would even touch him. (*Id.*). During an examination in December 1999, Plaintiff again jumped off the table before Dr. Spallino had even touched him. (R. 273). Dr. Spallino reported that this was "overactive [sic]" and "surprising" given that he did not even get near Plaintiff. (*Id.*). After Plaintiff failed to return phone calls, hung up on office staff and missed appointments, Dr. Spallino sent Plaintiff a letter on June 27, 2000 advising Plaintiff that St. Joseph's could no longer provide care except on an emergency basis. (R. 270-72). Finally, in November and December 2000, Plaintiff reported to Dr. Gallo and complained that Norco was not helping his headaches and claimed to have a migraine headache. (R. 308, 351). From December 2000 through October 2001, the record is devoid of any medical records relating to Plaintiff's headaches.

Plaintiff also sought treatment for his headaches at emergency rooms in September 1999 (twice), January 2000, and June 2000. (R. 228, 230, 238, 264). On September 8, 1999, Plaintiff

9

complained of a severe migraine headache similar to his previous headaches, some nausea, no vomiting, some blurred vision, and photophobia. (R. 228). Plaintiff received Demerol, Phenergan, Imitrex, and Humulin and his symptoms were partially relieved. (*Id.*). The physician diagnosed Plaintiff with a migraine, herniated intervertebral disk with myelopathy in the cervical region, and hyperglycemia. (*Id.*). About three weeks later, Plaintiff again reported to the emergency room complaining of severe migraine headaches, which started approximately two days prior to arrival at the emergency room, as well as neck and shoulder pains. (R. 230). He reported the headaches were similar to previous headaches and he had some nausea, no vomiting, no blurred vision, mild photophobia, no numbness, no weakness, and no fever. (*Id.*). The physician diagnosed Plaintiff with a classical migraine, ruptured intervertebral disk with no myelopathy and noted Plaintiff's injuries were from overexertion. (*Id.*). The physician prescribed Vicodin and Soma. (*Id.*). On January 31, 2000, Plaintiff reported to the emergency room with headache, neck pain and left shoulder and back pain for approximately seven days prior to arrival. (R. 238). The physician diagnosed Plaintiff with headache, neck pain, shoulder pain, and back pain and prescribed Demerol and Phenergan. (*Id.*). On June 25, 2000, Plaintiff reported to the emergency room with a "throbbing diffuse headache approximately 2 days prior to arrival" and identified a history of migraines with relief from Imitrex. (R. 264). He received Imitrex, which had no effect on his headache, and Dermerol and Phenergan, which improved his headache. (*Id.*). The physician diagnosed Plaintiff with a headache. (*Id.*). As detailed above, on October 31, 2001, Plaintiff sought medical attention for the injuries and pain related to the fall at his apartment. (R. 355-57).

In addition to the medical records, Plaintiff provided testimony regarding his headaches and associated pain. At the supplemental hearing, Plaintiff testified that his migraine headaches

constituted one of the major problems affecting his ability to work during the period at issue. (R. 473). He stated he had headaches three to four times per month lasting between three to five days per headache with the severity of the headaches reaching a level where they were so debilitating he would have to cover his head and eyes with a quilt to keep any light from coming in. (R. 469-70). To relieve the headaches, Plaintiff stated he used both shots and pills and eventually needed multiple shots of Imitrex to relieve his headaches. (R. 470). On most of the occasions where Plaintiff had a headache, he stated he would go to the emergency room, except on those occasions where his migraines were so severe that he could not move. (R. 470-71).

Dr. Linder also provided testimony at the hearing regarding Plaintiff's headaches and pain. He stated that some objective evidence in the record supported Plaintiff's complaints regarding the degree of headaches he described. (R. 485). When asked if the degree of pain associated with Plaintiff's headaches, as described by Plaintiff, was consistent with the objective evidence, the medical expert stated it was not impossible for someone who feels a headache to respond to the headache in the way Plaintiff describes. (R. 486). Dr. Linder noted, however, the general observations from the physicians regarding Plaintiff's credibility were that "the way he presented himself showed ambiguity or exaggeration of response." (R. 483).

Based on this record, the ALJ determined Plaintiff's headaches constituted a severe impairment which could be expected to produce the symptoms alleged but found Plaintiff's statements as to the frequency, intensity, and duration of his symptoms during the period at issue were inconsistent with the evidence of record. (R. 17). Specifically, the ALJ stated:

> [T]he claimant's statements as to the frequency, intensity, and duration of symptoms during the period February 1, 1999 to November 30, 2001, are inconsistent with the evidence of record and cannot be fully credited. The objective medical evidence for

11

the period at issue does not confirm the severity of the alleged pain, nor does the weight of the medical and non-medical evidence demonstrate the presence of an impairment that reasonably could be expected to produce pain and functional limitation to the degree alleged by the claimant.

(*Id.*). Basically, in assessing Plaintiff's subjective complaints of pain relating to his headaches, the ALJ found Plaintiff not credible. (R. 17, 20, 21). Where the ALJ discredits a claimant's subjective testimony as to pain, the ALJ must articulate explicit and adequate reasons for doing so. *Wilson v. Barnhart*, 284 F.3d at 1225. Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, the testimony be accepted as true. *Id.* As the ALJ correctly stated in his opinion, on several occasions physicians noted that Plaintiff appeared to exaggerate his symptoms, engaged in drug-seeking behavior, complained of the "usual chronic pain," sought pain shots or other medication from physicians, failed to follow up with physicians who did not prescribe narcotics, overused pain medications, utilized out-of-state pharmacies for prescriptions for pain medications, and did not comply with physicians' orders. *See* R. 20, 219-27, 270-80, 483. Substantial evidence supports the ALJ's reasons for discrediting Plaintiff's subjective pain complaints.

### 3. *Hypothetical*

At step five of the sequential analysis, the Commissioner must consider the assessment of the RFC combined with the claimant's age, education, and work experience to determine whether the claimant can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work, a finding of not disabled is warranted. *Id.* Conversely, if the claimant cannot make an adjustment to other work, a finding of disabled is warranted. *Id.* At this step, the burden temporarily shifts to the Commissioner to show

other jobs exist in the national economy which, given the claimant's impairments, the claimant can perform. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999) (citation omitted). Typically, where the claimant cannot perform a full range of work at a given level of exertion or the claimant has non-exertional impairments that significantly limit basic work skills, the preferred method of demonstrating the claimant can perform other jobs is through the testimony of a VE. *Id.* at 1229. The testimony of the VE is crucial to the ALJ in reaching a determination at step five of the sequential evaluation process because the VE is an expert with respect to the kinds of jobs an individual can perform based on his or her capacity and impairments. *See id.* at 1230; *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).

The ALJ must pose an accurate hypothetical that takes into account all the claimant's impairments. *See Pendley v. Heckler,* 767 F.2d 1561 (11th Cir. 1985) (*per curiam*). The ALJ's hypothetical posed to a vocational expert must comprehensively describe the plaintiff's limitations. *See id.* at 1562-63. Of course, the ALJ is not required to include limitations found not credible, and submits to the expert only those supported by objective evidence of record. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996), *see McSwain v. Bowen*, 814 F.2d 617, 620 n.1 (11th Cir. 1987). Plaintiff contends the ALJ erred by failing to pose a hypothetical question to the vocational expert that included all of Plaintiff's limitations, specifically any mental limitations as a result of depression and learning disability.[4]

As explained in his opinion, the ALJ found Plaintiff had the severe impairments of

---

[4] Since the undersigned finds the ALJ's decision to discredit Plaintiff's subjective complaints regarding his headaches supported by substantial evidence, the ALJ did not have to include any limitations with respect to Plaintiff's headaches in the hypothetical to the VE. *See Wolfe*, supra; *see McSwain, supra*.

13

depression and learning disability. (R. 17). Indeed, the records reflect that as a child Plaintiff suffered from depression and anxiety and had low average intelligence leading to a recommendation for placement and eventual enrollment in classes for the learning disabled (R. 196-213). Dr. Trimmer, a consultative examiner, evaluated Plaintiff in December 1999 and noted Plaintiff had no abnormalities in thought content or thought process, he claimed he was unhappy because of the constant and severe pain he experiences, his judgment appeared to be less than adequate, he had no problems handling money and could handle his own financial affairs, and his mood was mildly depressed with his affect flat. (R. 235-37). Dr. Trimmer conducted an intelligence test and noted Plaintiff functioned in the low average range of intelligence. (R. 236). After examining Plaintiff, Dr. Trimmer diagnosed Plaintiff as having an adjustment disorder with depressed mood and assigned him a GAF of 55. (R. 237).

Another consultative examiner, Dr. Kanakis, examined Plaintiff in November 2000. Plaintiff informed Dr. Kanakis that he suffered a low level of depression since the outset of his physical problems, denied the vegetative symptoms of depression as well as all other psychological symptomotology, had been prescribed Elavil for the prior two and a half years with some relief, and he spent his typical day in "pain" but was able to drive, cook and manage his own finances. (R. 312-14). Dr. Kanakis noted Plaintiff's thought processes were logical and coherent, he related in an appropriate manner and was accessible, he showed no signs of distress during the clinical interview, his mood was calm, his affect was appropriate, his energy level appeared to be normal, and his speech was normal and spontaneous. (R. 313). Additionally, Dr. Kanakis found Plaintiff's intelligence to be about average with his general fund of information good, his recent and remote memory intact, his attention good, his concentration fair, and his insight and judgment good. (*Id.*).

Dr. Kanakis diagnosed Plaintiff as having Dysthymic Disorder, Late Onset but noted that his prognosis with regard to the diagnosis was guarded. (*Id.*). He suggested Plaintiff might benefit from outpatient psychotherapy in addition to his prescription for Elavil. (*Id.*). Notably, Dr. Kanakis did not believe Plaintiff was at risk of suffering decompensation in a work-like setting. (R. 313-14).

In January 2001, a state agency psychologist, Dr. Mendelson, concluded Plaintiff suffered from Adjustment Disorder with Depressed Mood. (R. 327). As a result, Dr. Mendelson found Plaintiff would have mild difficulties in maintaining concentration, persistence and pace. (R. 325). Dr. Mendelson noted although Plaintiff had been described as moody and unhappy, Plaintiff had no discernable impairments in the functional capacity for a full range of routine day-to-day behaviors required for personal care, independent living, and reasonable social/avocational pursuits. (R. 327). Accordingly, Dr. Mendelson concluded that though Plaintiff may have a mental impairment, the impairment was not of disabling proportions.[5] (*Id.*).

In summarizing the consultative examinations, the ALJ noted that they revealed Plaintiff had a low average range of intelligence, intact memory, and only mild level depression; Plaintiff was diagnosed with only adjustment disorder and dysthymic disorder; Plaintiff did not receive treatment from mental health professionals during the period in question; and received the medications Elavil, Vistaril and Xanax from his primary care physician. (R. 17-22). The ALJ found Plaintiff's depression and anxiety resulted in mild restriction of daily activities, mild difficulty maintaining social functioning, moderate difficulty maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration during the period at issue. (R. 21). Based on these

---

[5] In rendering his decision, the ALJ accorded more weight to Dr. Trimmer than Dr. Mendelson regarding Plaintiff's mental impairments and limitations.

findings, the ALJ determined Plaintiff retained the RFC to perform a restricted range of sedentary to light work, restricted by the need for the opportunity to alternate between sitting and standing at will and the need to avoid climbing, balancing, and exposure to unprotected heights and dangerous moving machinery, for the period from February 1, 1999 through November 30, 2001. (R. 17). Accordingly, the ALJ posed the following hypothetical to the VE:

> If I found that the claimant had a maximum residual functional capacity for restricted range of sedentary to light work activity, restricted by the need to alternate sitting and standing, the avoidance of climbing, balancing, exposure to unprotected heights, dangerous moving machinery, could the claimant return to any of his former jobs?

(R. 488). In response, the VE opined that Plaintiff could not perform his former jobs but he could perform unskilled work existing in significant numbers in the national economy at both the light and sedentary levels for the period from February 1, 1999 through November 30, 2001. (R. 488-89).

Although the ALJ was not required to include limitations he found not credible, he should have submitted the limitations supported by the objective evidence of record. *See Wolfe*, 86 F.3d at 1078; *McSwain*, 814 F.2d at 620 n.1. As the Commissioner notes, the unskilled light and sedentary jobs identified by the VE would reasonably accommodate Plaintiff's moderate difficulties with maintaining concentration, persistence or pace because "unskilled work" requires little or no judgment to do simple duties that can be learned on the job in a short period of time. 20 C.F.R. §§ 404.1568(a), 416.968(a). In addition to those moderate difficulties, however, the ALJ explains that Dr. Trimmer's finding that Plaintiff had a GAF of 55 indicates Plaintiff had a moderate impairment in social and occupational functioning. (R. 18, 21). The hypothetical posed to the VE does not reflect any limitations relating to Plaintiff's moderate impairment in social and occupational functioning and the ALJ's opinion fails to indicate a reason for this omission. Thus, because the ALJ

16

failed to pose a hypothetical question comprising all of Plaintiff's impairments or providing an explanation or rationale for the omission, the VE's testimony does not constitute substantial evidence. *See Jones*, 190 F.3d at 1229. Accordingly, the decision is reversed and remanded with instructions to the ALJ to identify what, if any, limitations Plaintiff has on his ability to perform work as a result of his moderate impairment in social and occupational functioning and to pose a hypothetical to a VE incorporating all of Plaintiff's credible impairments and associated limitations.

*D. Conclusion*

For the reasons stated above, it is hereby

ORDERED:

1. The Commissioner's decision is REVERSED and the matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further administrative proceedings consistent with this Order.

2. The Clerk is directed to enter judgment for Plaintiff and close the case.

DONE and ORDERED at Tampa, Florida on September 21, 2009.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

cc: Counsel of Record